**Ronald BONNES and Christine Bonnes,**
**Appellants–Plaintiffs,**

**v.**

**R.P. FELDNER, M.D., and John**
**U. Lanman, M.D., Appellees–**
**Defendants.**

No. 64A03–9301–CV–29.

Court of Appeals of Indiana,
Third District.

Oct. 13, 1993.

Roger A. Weitgenant, Glenn J. Tabor, Blachly, Tabor, Bozik & Hartman, Valparaiso, for appellants-plaintiffs.

David C. Jensen, John M. McCrum, Eichhorn, Eichhorn & Link, Hammond, for appellees-defendants.

HOFFMAN, Judge.

Appellants-plaintiffs Ronald and Christine Bonnes appeal from judgments in favor of appellees-defendants R.P. Feldner, M.D., and John U. Lanman, M.D., in a medical malpractice action. The Bonneses' sole claim on appeal is that the trial court erred in granting judgment on the evidence in favor of Dr. Feldner.

The facts relevant to this appeal disclose that Dr. Feldner was the Bonneses' family physician for many years. In October of 1985, Ronald Bonnes began experiencing chest pain. Ronald was concerned about the pains because his father had died of coronary artery disease at the age of 38. From October 1985 to February 1986, Ronald saw Dr. Feldner for an evaluation of his condition. Dr. Feldner told Ronald that he was working too hard. In January of 1986, Ronald complained of an increase in chest pain, and Dr. Feldner sent him to Dr. Lanman, a specialist in internal medicine, for the performance of a cardiac stress test.[1] A resting electrocardiogram (EKG) was within normal limits. Ronald was then placed on the treadmill. The pace and the incline of the treadmill were gradually increased in three minute stages or intervals. As Ronald exercised, Dr. Lanman observed and monitored his heart rate and blood pressure. Six minutes and thirty seconds into the stress test, the test was halted because of Ronald's complaints that he was tired, short of breath, and was having chest pain. Throughout the test, the tracings of certain waves which appeared on the EKG, did not change significantly. During the test, Ronald's blood pressure and pulse rate were considered to be within the normal range. Dr. Lanman determined that Ronald's stress test was a normal submaximal stress test, except for the chest pain. Dr. Lanman and Dr. Feldner both told the Bonneses that Ronald's stress test was normal. Dr. Feldner had no further contact with Ronald.

In August of 1986, Ronald sought an evaluation from Dr. Arvind Gandhi, a cardiologist. Ronald told Dr. Gandhi that he was experiencing chest and jaw pain, as well as shortness of breath at rest, and some numbness and swelling of the left hand. Dr. Gandhi believed that Ronald might be experiencing angina pectoris, chest pain due to inadequate circulation to the heart. After performing a detailed examination of Ronald, Dr. Gandhi concluded that the chest pain Ronald exhibited was atypical, since his shortness of breath occurred at rest and the pain was produced without exertion.

Later in 1986, Ronald sought a second opinion from another cardiologist, Dr. John Arrotti. Dr. Arrotti took a history, performed a physical examination and an EKG. While the physical examination and the EKG were normal, Dr. Arrotti recommended the performance of a coronary angiogram to further evaluate the condition of Ronald's coronary arteries. The angiogram revealed coronary artery disease. Dr. Arrotti attempted an angioplasty to open Ronald's occluded arteries. Ronald

---

1. A stress test is designed to measure the circulation of blood to the heart. A physician and a technician monitor a patient's blood pressure and pulse rate as the patient walks on a treadmill. Gradually the level of exercise is increased until the patient reaches maximum fatigue. During the test, the electrical activity of the heart is traced onto strips of graph paper. The wave pattern produced by the tracings indicates whether there is a sufficient flow of blood through the patient's arteries supplying the heart.

sustained a heart attack during the procedure. Following the failed angioplasty, Dr. Arrotti suggested that Ronald have coronary artery bypass surgery. Ronald underwent a successful surgery.

After completion of the medical review panel proceedings, the Bonneses filed this civil action against Dr. Feldner and Dr. Lanman, on July 7, 1989. A jury trial began on October 5, 1992. During the trial, the Bonneses called as witnesses two physicians who specialized in cardiology, Dr. John Arrotti and Dr. Jack Ziegler. At the close of the plaintiffs' case-in-chief, Dr. Feldner moved for judgment on the evidence on the grounds that neither Dr. Arrotti nor Dr. Ziegler had expressed an opinion that he failed to meet the standard of care required of a family practitioner. Thereafter, the court entered judgment on the evidence in favor of Dr. Feldner. The trial continued as to Dr. Lanman, resulting in a verdict in his favor. The Bonneses now appeal from the judgment on the evidence in favor of Dr. Feldner.

 In reviewing the grant of judgment on the evidence, this Court considers only the evidence and inferences drawn therefrom most favorable to the nonmoving party. *Ross v. Lowe* (1993) Ind., 619 N.E.2d 911, 914; *Searcy v. Manganhas* (1981), Ind.App., 415 N.E.2d 142, 143, *trans. denied*. The evidence must support without conflict only one inference which is in favor of the defendant. *Ross*, 619 N.E.2d at 914. If there is any probative evidence or reasonable inference to be drawn from the evidence or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper. *Id.* However, judgment on the evidence is appropriate when, at the close of the plaintiff's evidence, there is a total absence of evidence or reasonable inferences on at least one essential element of the plaintiff's case. Ind.Trial Rule 50(A); *Palace Bar, Inc. v. Fearnot, Admx.* (1978), 269 Ind. 405, 409, 381 N.E.2d 858, 861.

The Bonneses contend that they presented a *prima facie* case against Dr. Feldner, and, thus, the trial court erred in granting

judgment on the evidence in his favor. More specifically, they argue that at the close of the plaintiffs' case-in-chief there was evidence in the record demonstrating the standard of care Dr. Feldner, as a family practitioner, owed to Ronald Bonnes and that Dr. Feldner deviated from the standard. The Bonneses focus on Dr. Feldner's failure to continue medical monitoring of Ronald's condition after the stress test was conducted and his failure to specifically refer Ronald to a cardiologist.

 As the Bonneses recognize, to establish a *prima facie* case of medical malpractice based upon negligence a plaintiff must show sufficient evidence of "(1) the standard of care the doctor owed the patient, (2) a breach of that standard, and (3) that the plaintiff suffered a compensable injury proximately caused by the defendant's breach of duty." *Vlach v. Goode* (1987), Ind.App., 515 N.E.2d 569, 572 *trans. denied*. The appropriate standard of care that a physician must exercise is "that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which he belongs, acting under the same or similar circumstances." *Vergara by Vergara v. Doan* (1992), Ind., 593 N.E.2d 185, 187. Locality, advances in the profession, availability of facilities, and whether the doctor is a specialist or general practitioner are factors to be consider in determining whether the doctor acted reasonably. *Id.* Thus, Dr. Feldner's conduct must be measured by the standard of care which applies to a family practitioner. Expert testimony as to what other reasonable doctors similarly situated would have done under the circumstances, is required. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 191.

 During plaintiffs' case-in-chief, the Bonneses offered the testimony of Dr. Arrotti, a cardiologist practicing in the south Chicago-northwest Indiana area. After a discussion of the studies and procedures he performed on Ronald, Dr. Arrotti was asked:

"Q Doctor, are you familiar with the standard of care for cardiac patients in northwest Indiana?

A Yes.

Q And based on that knowledge and your training, knowledge and experience, if an individual came to you at the age of 36 with a family history of coronary artery disease including a father who died at the age of 38 and uncles who died before the age of 55, who was complaining of constricting chest pains that radiated up into his jaw and had increased cholesterol levels, what would the course of treatment be for that individual?

A My approach to treating that patient would be to evaluate his cardiac situation, with—

Q What would comprise an evaluation of that cardiac condition?

A It would comprise possibly a stress test, possibly a thallium stress test, possibly an angiogram, depending on the exact situation."

Dr. Arrotti also testified that if he had a patient with a normal but submaximal stress test, who still complained of constricting chest and jaw pain, he would very likely perform a thallium stress test and perhaps an angiogram. Dr. Arrotti was then asked if this evaluation or treatment would be the appropriate standard of care for a 36–year–old male who complains of chest pains, with a family history of cardiac problems and increased cholesterol levels. In response, Dr. Arrotti explained that this was not an absolute standard of care; rather, this would be *his* approach under the circumstances presented.

Here, Dr. Arrotti was asked if he knew the standard of care for cardiac patients, not whether he knew the standard of care for a family practitioner treating such patients. It is unclear from his testimony whether the medical treatment he is describing is the standard of care for a cardiologist or for a family practitioner. As Dr. Feldner points out, Dr. Arrotti's testimony is carefully phrased in terms of what he, a cardiologist, would do in the circumstances and does not set forth the standard of care pertaining to a family practitioner such as Dr. Feldner. Similarly, in *Oelling*, the plaintiffs sought to withstand summary judgment through the affidavit of an expert who expressed his preferences with regard to management of the patient but did not express an opinion about what the standard of care required. In upholding the entry of summary judgment, the supreme court observed that the "[expert's] affidavit states only that he would have treated the Mr. Oelling differently, not that Dr. Rao's treatment fell below the standard of care." *Oelling*, 593 N.E.2d at 190. In the present case, the Bonneses failed to have Dr. Arrotti explain to the jury what standard of care would have been required of a family practitioner.

The Bonneses further rely on Dr. Arrotti's testimony to support their contention that Dr. Feldner had a duty to refer Ronald to a cardiologist. During re-direct examination, Dr. Arrotti stated that he was "not totally passing judgment on a GP [general practitioner] or family practitioner in that their mind set is somewhat different, and it becomes very difficult to put myself in their shoes." He further explained that, because of the wide range of a general practitioner's practice, it is often necessary for him to refer his patients to specialists. Dr. Arrotti, however, did not suggest that Dr. Feldner was required to refer Ronald, to comply with the standard of care required of a general practitioner under the circumstances presented in this case. Moreover, the evidence demonstrates that Dr. Feldner did, in fact, refer Ronald to Dr. Lanman, a specialist in internal medicine, for the performance of a cardiac stress test.

The testimony which the Bonneses elicited from Dr. Ziegler, a cardiologist and member of the Medical Review Panel that found in favor of Dr. Feldner, is equally unavailing. The Bonneses assert that Dr. Ziegler's testimony established that Dr. Feldner was required to continue monitoring Ronald's condition after the time the stress test was performed. At trial, Dr. Ziegler stated that based on his review of

the records, Ronald's condition and the results of the stress test, that in his opinion the standard of care required there be continued monitoring of Ronald. However, when asked if it would have been a breach of the standard of care to have failed to continue monitoring Ronald's condition, Dr. Ziegler explained that it would depend upon the conclusion of the tester. Dr. Ziegler stated that based upon Dr. Lanman's report and the conclusion of the test results communicated to Dr. Feldner, it was appropriate for Dr. Feldner not to recommend further follow-up care. Hence, Dr. Ziegler concluded that Dr. Feldner had not breached the standard of care.

■ The law in Indiana requires expert opinion as to the existence and scope of the standard of care which is imposed upon physicians and as to whether particular acts or omissions measure up to that standard. *McGee v. Bonaventura* (1993), Ind. App., 605 N.E.2d 792, 794. " 'Before a trier of fact may confront the factual question [of negligence] the issue must be placed in controversy by reference to expert opinion.' " *See id., quoting, Bassett v. Glock* (1977), 174 Ind.App. 439, 368 N.E.2d 18, 23. In the present case, there was no competent evidence presented from which the trier of fact could have inferred that under the circumstances Dr. Feldner violated the standard of care pertaining to a general practitioner. Neither of the Bonneses' expert witnesses presented evidence from which it could be inferred that Dr. Feldner, a general practitioner, breached the standard of care to his patient under the circumstances of this case.

■ The Bonneses also point to the opinion of the Medical Review Panel as evidence that Dr. Feldner breached the standard of care. IND.CODE § 16-9.5-9-9 (1988 Ed.) permits the introduction of the Medical Review Panel's opinion "as evidence in any action subsequently brought by the claimant in a court of law...." IND.CODE § 16-9.5-9-9. As Dr. Feldner points out, the statute, however, does not waive the rules of evidence requiring that official documents be properly authenticated prior to their admission. *See* Ind.Trial Rule 44(A)(1); *McGee*, 605 N.E.2d at 794 (*certified* opinion of the medical review

panel is admissible in a medical malpractice action); *Stackhouse v. Scanlon* (1991), Ind. App., 576 N.E.2d 635, 640, *trans. denied* (opinion of medical review panel was properly certified, as required for consideration in ruling upon motion for summary judgment).

The copy of the Medical Review Panel's opinion offered into evidence by the Bonneses was not certified by the Indiana Department of Insurance which administers the medical review panel process. Hence, it would have been improper for the jury or the judge, in considering a motion for judgment on the evidence, to consider the uncertified copy of the opinion which was improperly admitted into evidence over the defendants' timely objection. The trial court did not err in failing to consider the opinion issued by the Medical Review Panel.

The Bonneses failed to present sufficient evidence of a *prima facie* case of medical malpractice as to Dr. Feldner. The trial court, therefore, properly granted Dr. Feldner's motion for judgment on the evidence.

Affirmed.

GARRARD and RUCKER, JJ., concur.